DETERMINED IN THE

# FIRST DEPARTMENT,

AT

## GENERAL TERM,

### January, 1884.

---

## In the Matter of EDNA ELVIRA LARSON.

*Child — right of the Female Guardian Society of New York to allow some suitable person to adopt it — when it is to be deemed abandoned — 1849, chap. 244 — Writ of* habeas corpus *should not issue when the person is not in the custody of the respondent at the time of the application.*

One Larson having left his wife Engla, in New York, in October, 1873, went to work on a steamer sailing to Europe; the wife went into service as a cook, and there remained until February, 1874, when, being about to become a mother, she was admitted into a hospital, where, on April 9, 1874, a daughter was born. In May following the ladies of the hospital procured board for the mother and her child with a Mrs. Burpo, at Dobbs Ferry. The mother remained there until August of that year, when she returned to New York and entered into service, leaving her child with Mrs. Burpo under an agreement to pay her ten dollars a month for its board. She paid this sum until June, 1875, when being out of service she could no longer do so. In March, 1876, she went to Sweden and there learned of her husband's death. She had not seen or communicated with Mrs. Burpo for several months before leaving this country. She left five dollars with a friend to be given to her, but it was never delivered. Mrs. Burpo, being unable to support the child, took it, in January, 1876, to a branch of the American Female Guardian Society, in New York, where it remained until the following February, when, with the consent and approval of the superintendent of the alms-house of the city of New York, it was indentured for adoption as authorized by the charter of the society (1849, chap. 244). After the mother returned to this country she heard that her child had been placed with the said society and went to inquire about it, and was then told by the matron that the child had been adopted, that she could never get it again and that she had better try and forget it. In February, 1880, she mar-

ried again, and in 1883 applied by a writ of *habeas corpus* to compel the society to produce and surrender the child.

*Held*, that the mother had abandoned or neglected to provide for the child, within the meaning of those words as used in the eighth section of the charter of the society, and that the society was authorized to indenture the child for adoption, as it had done, without the consent of the mother, upon receiving the consent and approval of one of the officers declared by the said section to be the legal guardians of the child.

That chapter 830 of 1873, providing for the adoption of minor children, did not affect or modify the provisions of the act incorporating the society relating to that subject.

That the application should also be denied for the reason that it appeared that the child had not been in the custody or control of the society since 1876, and that the mother had knowledge of this fact when she made the application.

That an order requiring the society to make a further return showing to whom, at what time, for what cause and by what authority it had parted with the custody of the child, was improperly granted and should be reversed.

APPEAL from an order of the Special Term directing the society known as the " Home of the Friendless " to make a further return to the writ of *habeas corpus* in this case, disclosing to whom, at what time, for what cause and by what authority the transfer of the custody of " one Edna Elvira Larson, the petitioner's daughter, was made."

The " Home of the Friendless " is a branch of the "American Female Guardian Society," which was incorporated by chapter 244 of 1849. By the sixth section of the act the board of managers were authorized to place a child, surrendered to it by its natural or legal guardians, by adoption or at service in some suitable employment, and with some proper person or persons, conformably to the laws of this State in regard to the binding out of indigent children, provided, that the terms of the indenture should be approved by the commissioners of the alms-house or by the surrogate of the city of New York. The eighth section provided that, in case of the death or legal incapacity of a father, or his abandoning or neglecting to provide for his family, the mother should be deemed the legal guardian of her children, for the purpose of making such surrender, and that " in all cases where it is not known that there is within the State any person legally authorized to act in the premises, the mayor, alms-house commissioner, or surrogate of New York, shall be, *ex officio*, the legal guardians for the like purpose."

The petitioner also claimed to be entitled to an inspection of the books of the society under chapter 411 of 1869.

*E. Gebhard*, for the Home of the Friendless, N. Y., appellant.

*J. F. MacShane*, for Engla A. Andrews, mother of Edna Elvira Larson, respondent.

DAVIS, P. J.:

The facts in this case, as they appear in the papers before us, are in substance as follows: In November, 1872, one John A. Larson, and his wife, now Engla A. Andrews, who is the petitioner in this matter, came to this country from Sweden. They remained here until October, 1873, when John A. Larson left, telling the petitioner he had got work on a steamer sailing to Europe, and would have to leave her for a while. The wife shortly after went into service as a cook, and remained in service until February, 1874, when she was about to become a mother, and through some friends obtained admission to a hospital in Marion street, in this city, where on the 9th day of April, 1874, the child, who is the subject of this proceeding, was born. In May following the ladies of the hospital procured board for the petitioner and her child with a Mrs. Burpo, at Dobbs Ferry, where she remained until August of that year when she came back to the city and procured service as a maid and seamstress. She left her child with Mrs. Burpo under an agreement to pay her ten dollars a month for its board. From August, 1874, until June, 1875, she paid this sum monthly. At that time she went out of service and was unable to earn money to pay for the board of the child. It does not appear by her statement that she afterwards paid anything on the board, or visited, or saw the child. About the 1st of March, 1876, she went to Europe, and arrived in Stockholm, Sweden, about the first of May. There she was informed that her husband had died and been buried at sea. For several months prior to leaving the country she had not seen her child, nor paid anything for its support or communicated with Mrs. Burpo, but at the time of leaving she left five dollars in the hands of a fellow servant with directions to send the same to Mrs. Burpo and to tell her that she had gone to Europe and would be back in a couple of months. This circumstance shows the degree of her

neglect, for Mrs. Burpo had about two months before taken the child to the Home of the Friendless. Neither the money nor the message was sent to Mrs. Burpo. A year afterwards, and in the latter part of March, 1874, the petitioner returned from Europe. Mrs. Burpo testifies that after August, 1875, she heard nothing of the child's mother and received nothing for the care of the child, and having a large family of her own and being in very poor circumstances, she, in January, 1876, took the child, under the advice of some charitable persons, to the Home of the Friendless and left it there. The ladies in charge of the Home received the child in pure and tender charity because of its utter helplessness. It was their simple duty and they performed it faithfully.

On her return to this country, the petitioner learned for the first time that her child had been placed in the Home of the Friendless, although it had been sent there in January, 1876, two months before she went to Europe. This fact fully justifies Mrs. Burpo's statement as to the reasons which compelled her to take the child to the Home. The petitioner testifies also, that she then went to the Home of the Friendless and saw the matron in charge and told her she was the mother of the child, and asked for it. She was then informed, she says, that the child had been " adopted out," and that she could never get it again ; and the matron advised her to try and forget it. In February, 1880, she married one William Andrews, her present husband. In April, 1883, she sued out the petition in this case.

The return to the petition shows that at the time of the service of the writ the said Edna Elvira Larson was not in the custody or under the power or restraint of the said Society of the " Home for the Friendless."

That a child of similar name was for a short time during the month of January, 1876, in the " Home for the Friendless," in said city ; that the said child was brought to said "Home" by a woman who claimed that it had been abandoned by its mother, and was in need of the care which might be extended by said institution.

That, with the consent and approval of the superintendent of the alms-house of the city of New York, who, by virtue of an act " To incorporate the American Female Guardian Society," passed April 6, 1849, by the legislature of the State of New York, was created

and constituted the guardian of such children, the said child was duly indentured for adoption, and that since the month of February, 1876, has not been in the custody, or under the control of the "Home for the Friendless."

It seems very clear from this state of facts that the child was, within the meaning of the provisions of the act incorporating the American Female Guardian Society and the acts amendatory thereof, one which the mother had "abandoned or neglected to provide for" within the eighth section of that act. Whatever may have been her intention in that respect, the practical and real fact is that the petitioner had left her child for many months in the hands of Mrs. Burpo, making no provision for its support or care, neither visiting it herself nor letting Mrs. Burpo hear from her, until by reason of her poverty that lady was obliged to deliver the child to the Home of the Friendless for its care and protection. If in their power, it was the duty of the ladies in charge of that institution to receive and care for the helpless infant, and upon such a state of facts, a governor of the alms-house, or either of the other officers named in the eighth section of the act, became the legal guardian of the child, with power to approve of the disposition which it seems was afterwards made of the child by the Home of the Friendless, or, in other words, by the American Female Guardian Society, of which the Home of the Friendless is a branch organized for the care of children. It was not necessary that the child should have been surrendered by the mother to the society, but it was sufficient that she should have abandoned it or neglected to provide for it. In that case, the assent of the governor of the alms-house to its being "adopted out," constituted a lawful surrender and adoption of the child. The provisions of the act for the adoption of minor children (chap. 830, Laws of 1873) have nothing whatever to do with such cases, and have not affected the provisions of the act incorporating the Female Guardian Society, and the amendments thereto.

It follows that the return shows that the Home of the Friendless was in the lawful custody of the child in January, 1876; that in February, 1876, it made a lawful disposition of the child, and from that time forth ceased to have its custody; and that upon the showing of such a state of facts, the prayer of the petitioner is completely answered, because the parent, under such circumstances,

has no lawful right to pursue and retake the child, and especially none to harass with litigation the Home of the Friendless, which temporarily sheltered and cared for her destitute and neglected babe.

But another reason why the order should not have been made is found clearly apparent from the fact that the case is one in which the writ of *habeas corpus* is not at all applicable. The child was not, at the time the writ was sued out, restrained of her liberty in the Home of the Friendless, nor, upon the facts appearing, anywhere else. She *had* left that home in care of her adopted parents *more than seven years before the issuing of the writ*. All the facts in respect to her being in the Home of the Friendless and her being taken therefrom by adoption, were well and fully made known to the petitioner *more than six years* before suing out her writ. There was no excuse or justification for making oath that on the 10th of April, 1883, " the child was restrained of her liberty in the Home of the Friendless," for it was neither true in fact nor in law ; and it definitely appears that it had been known to the petitioner not to be true for more than six years. In the meantime no step had been taken either by the petitioner, while she bore the name of her former husband, nor after her marriage with her present husband, for a period of nearly or quite six years after she was informed of what had taken place, to ascertain where the child was, nor who had adopted her, nor how she was taken care of. The child is now nearly ten years of age. She was taken by her foster parents when she was less than two years old. In their house she has been reared, naturally regarding them as her only parents, and probably loved by them as their own child until she had reached a period of life when it would be cruelty both to her and them to break up their relations. They, upon the facts now appearing, have the lawful custody of her, as already shown. The writ of *habeas corpus* was not designed for any purpose but to relieve persons illegally detained or imprisoned from unlawful custody. More than seven years had elapsed since the Home of the Friendless parted with the custody of the child, and that fact being well known to the petitioner it was an abuse of the right to obtain the writ, to cause it to be issued against the Home of the Friendless. It might with equal propriety have been sued out and issued against Mrs. Burpo, the nurse, in whose hands the child had been left, and who

had been constrained, by the neglect of the mother to make any provision for it, to place it under the charity of the ladies of this society for its own care and protection.    When it appeared that the allegations of the petitioner, in respect to the custody of the child were untrue, and had been so for many years, the court should have dismissed the writ.    The writ of *habeas corpus* is not designed as a mode of obtaining evidence with a view to ascertain where children, who have been under the lawful care of charitable institutions and have been placed in other homes, can be found after the lapse of many years.    It is an abuse of the writ when it is used, as in this case, with knowledge that the custody of the child is not now, and has not been in the possession of the institution for many years.    It is apparent that the sole object of the petitioner was to ascertain facts which, it is claimed, are within the records of the institution, and which records it is insisted the petitioner has by statute a lawful right to inspect.    If that be so, the law provides another and an adequate remedy, quite different from the harassment of charitable institutions by the process of *habeas corpus*, under such circumstances as this case discloses.

The order should be reversed, with costs, and the writ dimissed.

DANIELS, J., concurred.

Present — DAVIS, P. J., and DANIELS, J.

Order reversed, with costs and writ dismissed.